UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DEANDRE HOLLAND, | ) | Case No.: 5:24 CV 14 |
| | ) | |
| Plaintiff | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF AKRON, *et al.*, | ) | |
| | ) | |
| Defendants | ) | ORDER |

Currently pending before the court in the above-captioned matter is Defendants City of Akron, Richard Kuznik, and Christopher Brown's (collectively, "Defendants") Motion for Summary Judgment. (ECF No. 28.) For the reasons below, the court grants the Motion.

## I. BACKGROUND

### A. Factual Background

DeAndre Holland is an African-American man who was hired by the City of Akron Police Department ("APD") in March 2018, and sworn in as a police officer on May 4, 2018. (ECF No. 1, Compl. ¶¶ 14, 46; ECF No. 22 Ex. 2, Personnel Forms at PageID 591–93.) When he was hired, Holland was already serving as a Sergeant in the Ohio Army National Guard. (Compl. ¶ 14.) He began his military service in the First Battalion, 145th Armor Regiment, under Battalion Commander Lieutenant Colonel Charles Buchanan, and Training Non-Commissioned Officer ("NCO") Sergeant

Bradley J. Hoffman. (ECF No. 7 Ex. 2, 03/12/21 Report of Investigation at PageID 64.) Buchanan left the Commander position in April 2019, and from roughly August 2019 to November 2020, Hoffman left his Training NCO position due to overseas deployment. (*Id.* at PageID 64–65, 69.) Additionally, in September 2020, Holland was "temporarily assigned to a different unit," with temporary transfer to the Joint Force Headquarters ("JHFQ") in Columbus, Ohio. (ECF No. 22 Ex. 1, Holland Dep. Tr. at PageID 358–59.)

Holland's military service was known to APD when they hired him, as was the requirement that he periodically take leave from work for military trainings and drills. (Compl. ¶ 15; Mot. at PageID 1341.) APD's policy regarding military leave is "governed by Akron's ordinance, the applicable collective bargaining agreement, and executive orders issued by the Mayor, all of which are consistent with the Uniformed Services Employment and Reemployment Rights Act ('USERRA')." (Mot. at PageID 1343.) Thus, for employees who are also service members, APD "offers . . . pay differential so that they will not suffer any loss in earnings while performing military service such as attending required military drill." (*Id.*) To qualify, an employee "must submit documentation of his military pay." (*Id.* (citing ECF No. 25 Ex. 1, Leeser Dep. Tr. at PageID 1185).) Moreover, "an employer has the right to verify" documentation, to ensure it is "honest, truthful, and accurate." (*Id.* (citing Holland Dep. Tr. at PageID 279).)

Holland was one of "several officers" in APD also serving in the National Guard, all of whom are required to submit the aforementioned documentation regarding leave for military trainings and drills. (03/12/21 Report of Investigation at PageID 61.) Typically, "[i]t is common practice for officers serving in the military to bring copies of their orders [reflecting the dates of trainings and drills] to their sergeant at the beginning of the fiscal year." (*Id.* at PageID 61–62.)

However, Holland did not provide his yearly drill schedules in advance. (*Id.*) When Holland was "asked . . . several times to try and a [sic] get a drill schedule for the entire year," he "stated he asked his superiors in the National Guard multiple times without success and usually received the orders within several days of when he was expected to be at drill." (*Id.* at PageID 62.) Thus, instead, for Holland's first two years at APD, he submitted separate documentation—or "drill letters"—as trainings and drills arose. (*Id.* at PageID 61–71; ECF No. 22 Ex. 2, Drill Letters at PageID 664–719.)

Unbeknownst to his APD supervisors who reviewed his drill letters, Holland "created the letters" that he submitted, "using a template provided to him by his commanding officer in the Guard, with permission to adjust the dates as appropriate." (Holland Dep. Tr. at PageID 479; Compl. ¶ 1.) The "template" Holland used was a word document that Sergeant Bradley J. Hoffman ("Hoffman") sent to Holland on August 2, 2018, upon Holland's request for "drill memorandums I could fill out myself." (Compl. ¶ 1; Mot. at PageID 1348 (citing Holland Dep. Tr. at PageID 332, 335); *see also* Holland Dep. Tr. at PageID 331 ("Can you send me one I can feel [sic] out and I will do myself if that is cool.").) When Hoffman sent the template, both were assigned to "[t]he 145th HHC," and Hoffman told Holland he had permission to "edit that for whenever we have drill." (Holland Dep. Tr. at PageID 332, 335; ECF No. 7 Ex. 3, 03/24/22 Report of Investigation at PageID 89.) Holland was "not permitted to create drill letters," but was "permitted to edit them for the correct dates." (Holland Dep. Tr. at PageID 252.) Holland stated: "[A]ll I could do is change the dates on them. I didn't do anything else. And I think I fixed that pay thing on there too." (*Id.*)

APD did not know Holland was creating drill letters himself, and did not know Holland "had permission to do that, before [he] started submitting them." (Holland Dep. Tr. at PageID 356.) Indeed, Holland did not tell "Akron," nor "any of [his] supervisors" at APD. that he "was going to

be creating his own drill letters and representing them to be signed by [Hoffman]." (*Id.*) Thus, "[f]or two years, Plaintiff submitted these notices, without issue, by regularly using [the] template"—even after Hoffman left his role as Holland's superior officer for deployment. (Compl. ¶¶ 1, 18; Holland Dep. Tr. at PageID 335; *see also* 03/12/21 Report of Investigation at PageID 61–71; Drill Letters at PageID 664–719.) After Hoffman deployed, Holland's contact at the National Guard was Sergeant Benjamin Kot. (Holland Dep. Tr. at PageID 353.) Holland did not ask or receive permission from Sergeant Kot to create drill letters, reasoning that he "didn't have to, because [he] already had [permission] from Hoffman." (*Id.*)

Holland contends that, "[n]o one at APD took issue with any such letters . . . until December 2020." (Compl. ¶ 18, 22–25; *see also* Mot. at PageID 1344–45.) In December 2020, Holland requested time off for military drills, using the aforementioned template with an altered date—but, this time, it was flagged as suspect by then-Lieutenant Richard Kuznik ("Kuznik"). (Compl. ¶ 18, 22–25; Mot. at PageID 1344–45.)

1.      December 25, 2020 Drill Letter and Subsequent Investigation

On December 28, 2020, Kuznik learned of a drill letter Holland submitted three days prior, on December 25, 2020. (Mot. at PageID 1344; ECF No. 24 Ex. 1, Kuznik Dep. Tr. at PageID 932.) The drill letter stated: "[Holland] will be performing/has performed duties as a member of HHC 1-145th AR RGT" from "28th December 2020 – 1th [sic] January 2021." (Drill Letters at PageID 719.) Upon reviewing the drill letter, Kuznik "had concerns over [its] validity," because: "[t]his was [Holland's] second set of orders for the month," "his unit drilling on New Years Eve and New Year's Day was unlikely," and "the orders were issued to him on Christmas Day . . . when very few people are in the office to issue such orders, including the National Guard." (03/12/21 Report of

Investigation at PageID 62; *see also* Kuznik Dep. Tr. at PageID 932–33.) After consulting with, and at the direction of, his direct superior Deputy Chief Mike Caprez, Kuznik sought clarification from the National Guard. (ECF No. 28 Ex. 2, Kuznik Decl. ¶¶ 5–8.) He eventually connected with Hoffman, who originally gave Holland the template, and who "had recently returned from a year-long deployment and was unaware of Plaintiff's drill schedule or drill habits in his absence."(Kuznik Dep. Tr. at PageID 885–86, 926–36; 03/12/21 Report of Investigation at PageID 62.)

During their phone conversation, Hoffman stated that "he believed the drill letter to be fake and further confirmed that neither he nor any member of his staff drafted [it]." (Mot. at PageID 1345 (citing Holland Dep. Tr. at PageID 398; 03/12/21 Report of Investigation at PageID 732–33; Kuznik Dep. Tr. at PageID 944; Kuznik Decl. ¶ 8.) Moreover, "Hoffman pointed out several irregularities on the form including the date of issue, Christmas Day, the name of the battalion commander, [who] left the unit almost two years ago, and the fact that his own name, Sgt. Hoffman, should not have been listed as the issuing party at the bottom." (03/12/21 Report of Investigation at PageID 62–63.) Hoffman did not tell Kuznik about having given permission to Holland in 2018 to edit the letters. (*See id*.; Brown Dep. Tr. at PageID 1238–40 (explaining Hoffman first admitted he gave permission when he "told [Brown] for the first time in [his] third interview," in March 2022).)

Deputy Chief Caprez also "instructed [Kuznik] to contact" Lieutenant Christopher Brown ("Brown") in the Office of Professional Standards and Accountability ("OPSA"), to "schedule a time to visit Ofc. Holland's unit and speak with his superiors in person." (*Id.* at PageID 63.) On December 29, 2020, Kuznik and Brown traveled to the National Guard Unit (the "Unit") in Stow, Ohio, where Brown, "alone," conducted interviews. (Kuznik Dep. Tr. at PageID 934–35; Kuznik Decl. ¶ 10.) In interviews conducted by Brown, multiple members of the Unit, including Hoffman,

confirmed their belief that drill letters submitted by Holland were fraudulent. (*Id.* at PageID 885–86, 926–36; 03/12/21 Report of Investigation at PageID 62.) For example, Benjamin Kot, Readiness NCO of the Unit, was "shown approximately 15 military drill letters . . . submitted by Holland for military leave," and "confirmed that these were all fraudulent." (03/12/21 Report of Investigation at PageID 63–64.) In Hoffman's interview, he "confirmed . . . the drill letter submitted . . . on 12/25 was fraudulent," and indicated "that it looks like [Holland] just wanted to get off work." (*Id*. at PageID 64–65.) Furthermore, Hoffman concluded numerous other previously-filed letters were fraudulent, after "compar[ing] the drill letters with military pay records." (*Id.* at PageID 65–72.) Accordingly, "Kuznik submitted a confidential report" to OPSA. (*Id.* at PageID 61–63.) After he submitted his confidential memorandum on December 30, 2020, Kuznik had "no further involvement in Akron's investigation into Holland's misconduct." (Kuznik Decl. ¶¶ 11–12.) Holland was put on paid administrative leave, effective immediately. (ECF No. 22 Ex. 2, Chief's Directive at PageID 729.) Brown and "other members of OPSA" continued the investigation concerning Holland's drill letters. (ECF No. 28 Ex. 3, Brown Decl. ¶ 4; *see also* Kuznik Dep. Tr. at PageID 885, 934–36, 942.)

Ultimately, Brown produced two Reports of Investigation, on March 12, 2021, and on March 24, 2022. (ECF Nos. 7 Exs. 2–3 at PageID 61–91.) As stated in the Report from March 12, 2021, OPSA's investigation concluded "investigators were able to determine that Holland submitted to [APD] at least 19 military drill letters that were not legitimate. . . . several of the letters had been revised numerous times . . . . Witnesses and military officials indicated that Holland was not authorized to create his own drill letters." (03/12/21 Report of Investigation at PageID 87.)

2.      Holland's Indictment and OPSA's Continued Pre-Trial Investigation

After the March 2021 Report, "the information gathered as part of the OPSA investigation was provided to the Summit County Prosecutor's Office for their review." (Brown Decl. ¶ 5.) Thereafter, "the Summit County Prosecutor made the decision to present this matter to the grand jury . . . for theft in office, tampering with records, and forgery." (Mot. at PageID 1347 (citing Holland Dep. Tr. at PageID 413, 419).) On April 16, 2021, the grand jury indicted Holland on all three counts. (ECF No. 7 Ex. 4, Indictment at PageID 92–93; Holland Dep. Tr. at PageID 413.)

Thereafter, "[i]n March 2022, almost a year after his indictment and just a few months before trial, [Holland's] third criminal lawyer submitted information to the prosecutor that included a text message that Hoffman had allegedly sent to Plaintiff . . . that Plaintiff could use a form drill letter to make corrections to the dates 'whenever we have drill.'" (Mot. at PageID 1348 (citing Holland Dep. Tr. at PageID 320–21, 423).) Brown produced an additional Report of Investigation on March 24, 2022, reflecting this new information. (ECF No. 7 Ex. 3, 03/24/22 Report of Investigation at PageID 89–91.) The Report detailed "that [Hoffman] sent it and that Holland could edit it for whenever he had drill," and Hoffman "thought it was fraudulent for Holland to continue use [sic] these drill letters when he was not even in the unit anymore"—*i.e.*, "while Hoffman was deployed overseas." (*Id.* at PageID 89–90.) The Report also recounted Hoffman's statement that "Holland should not have used these drill letters with Hoffman's name on it while he was assigned to JHFQ. In fact, anything after August 2019 when he had no contact with Holland." (*Id.* at PageID 90.)

In addition, "[b]ased on the presentation of this new information" regarding Holland being told he had permission to edit, Brown re-interviewed Hoffman on April 18, 2022. (Brown Decl. ¶ 8–9; ECF No. 22 Ex. 2, 08/30/22 Report of Internal Investigation at PageID 808–12.) This was the first time that Brown learned of, and Hoffman stated, that he had given Holland permission to edit

back in 2018. (Brown Dep. Tr. at PageID 1238–40.) At that interview, Hoffman was "asked if the scope of his permission lasted for years, and [he] said no." (Holland Dep. Tr. at PageID 439–40.) Moreover, Hoffman "state[d] that he would have expected any of his soldiers to contact him before creating a drill letter for training, especially the one with his name on it . . . ." (*Id.*) Brown concluded: "the investigation revealed evidence that Holland had submitted false documentation to Akron in order to receive pay differential on dates that he was not paid by the military." (Brown Decl. ¶ 9; *see also* Reports at PageID 61–91, 808–12.)

Roughly one month after Hoffman's re-interviewing, Holland's case proceeded to bench trial.

3.     Holland's Acquittal on the First Day of Bench Trial

On May 12, 2022, the criminal case against Holland proceeded to a bench trial before Judge Patricia Cosgrove. (Compl. ¶ 26; ECF No. 7 Ex. 1, Criminal Trial Tr. at PageID 54–60.) The trial concluded the same day, when Judge Cosgrove granted Holland's motion for "acquittal under Ohio Crim. R. 29." (Holland Dep. Tr. at PageID 272–73; Criminal Trial Tr. at PageID 60.) Before ruling, Judge Cosgrove noted: "there is no question that [APD] had probable cause to bring these changes [sic]. . . . Case law says if someone is indicted, then they have probable cause. They had probable cause based in some part, if not large part, on the information that Sergeant Hoffman gave that these were all fraudulent documents. . . . the [APD] did a good job of their investigation." (Criminal Trial Tr. at PageID 55–56.) However, Judge Cosgrove ruled that reasonable minds could not differ on the evidence," find[ing] the State has failed to produce the requisite evidence to warrant this case going further." (*Id.* at PageID 60.) Accordingly, on May 12, 2022, Holland was found "not guilty on all offenses in the indictment," and ordered for "immediate discharge." (*Id.*)

4.     Post-Acquittal Internal Investigation Resulting in No Disciplinary Action

-8-

Following his acquittal, Holland "returned to work on May 23, 2022 and received back pay for the time he was on unpaid leave." (ECF No. 22 Ex. 2, Employment Records Letter at PageID 787; *see also* Mot. at PageID 1349.) He had been "on unpaid leave [since] April 16, 2021," but he "was never terminated from his employment" at APD. (Employment Records Letter at PageID 787.)

In the month following his acquittal, June 2022, "an[] internal investigation was ordered by Chief Mylett [to] ascertain if any Akron Police Department Rules, Regulations or Policies were violated by Officer Holland's conduct." (08/30/22 Report of Internal Investigation at PageID 789 (cleaned up).) This included an interview of Holland on June 7, 2022, conducted by Lieutenant Scott Lietke, and two other officers at OPSA. (*Id.* at PageID 792; Holland Dep. Tr. at PageID 274–75, 455.) In August 2022, APD's internal investigation culminated in a 55-page Report written by Lieutenant Scott Lietke ("Lietke"), summarizing OPSA's information and findings. (08/30/22 Report of Internal Investigation at PageID 788–842.) In one portion, Lietke states that, through the internal investigation,"it became clear that the military pay records could not be used as a sole basis for any potential internal violations. The Ohio National Guard had clearly done a shockingly poor job of keeping track of Officer Holland's attendance and pay." (*Id.* at PageID 823.) The Report also indicates how other National Guard members were interviewed about Holland's drill letters, and "[a]ll of the soldiers interviewed in the criminal investigation stated that it is widely known and accepted in the Ohio National Guard that while this practice goes on from time to time in its [sic] neither permissible nor accepted by supervision." (08/30/22 Report of Internal Investigation at PageID 827.) In its conclusion, the Internal Report identified remaining "questions to be resolved," and related potential violations. (*Id.* at PageID 827–31.) It first noted the remaining "scope" question of whether Holland's permission to edit the template "expire[d]" when Hoffman deployed, and/or

when Holland transferred units, and concluded: "[i]f the Chief of Police finds that these documents were fraudulent or not accurate," then "he would have the option of finding a Violation of [APD Policy 700.03]." (*Id.* at PageID 828.) It also noted remaining questions of whether "Holland bears . . . responsibility for not completing his training requirements to the military's satisfaction, thereby causing him to create additional drill letters and require additional time away from work," and whether "[i]n June of 2019 . . . Holland attended military training," and concluded: "[i]f the Chief of Police finds . . . Holland is at fault" or "did not attend training," then he "may find [violations of APD Policy 700.03 or 700.08] occurred." (*Id.* at PageID 828–31.) Nonetheless, ultimately, no disciplinary action was taken against Holland, "for the conduct relating to [his] creation of drill letters and the concern . . . about the honesty of those records." (Holland Dep. Tr. at PageID 455–56; *see also id*. at PageID 275–76.)

### 5.     Holland's Internal Complaint to Human Resources

On June 16, 2022, nine days after he was interviewed for OPSA's internal investigation, Holland filed an Internal Complaint of Discrimination with APD Human Resources for alleged race and military status discrimination. (ECF No. 22 Ex. 2, Internal Complaint at PageID 597–98.) Three days prior, on June 13, 2022, Holland had emailed APD's Human Resources Director "to make a formal racial harassment complaint." (ECF No. 22 Ex. 2, H.R. Email at PageID 599.)

On December 22, 2022, a few months after the Internal Report was completed, Human Resources ("HR") sent Holland "a follow up of the investigation into [his] claims of discrimination and/or harassment." (ECF No. 22 Ex. 2, Human Resources Letter at PageID 843–44.) In it, they informed Holland that his claims were "found not to be substantiated." (*Id.*) As for his claim of racial discrimination, HR stated: "the facts indicate that there were several different factors that raised

reasonable concerns about improper conduct relating to the drill letter and associated military leave. . . . These factors constitute legitimate, non-discriminatory bases for investigating whether or not your conduct was proper under the law and/or City and departmental policies." (*Id*. at PageID 843.) As for his claim of military status discrimination, HR stated: "there is nothing to suggest that those you accused have any animus towards military servicemembers or that they acted *because* of your military status . . . other military servicemembers also working for APD at that time presented their military drill dates at the beginning of the military fiscal year and did not present orders containing similar anomalies to those present in your drill orders . . . . [T]hese factors constitute legitimate, non-discriminatory bases for investigating your conduct." (*Id*. at PageID 843–44.)

> 6.    Holland's Charges Filed with the Ohio Civil Rights Commission and Equal Employment Opportunity Commission

Thereafter, on October 6, 2022, Holland submitted a signed and notarized Employment Charge of Discrimination to the Ohio Civil Rights Commission ("OCRC"). (ECF No. 7 Ex. 5, Ohio Charge of Discrimination at PageID 95–96.) The only Charge Holland filed was against APD, and he listed the date of discrimination as . . . the date of [his] trial," May 12, 2022. (Holland Dep. Tr. at PageID 461–63.) On the form, Holland checked boxes indicating he "was subjected to" the following: "demotion"; "discharge/termination"; "discipline"; "harassment"; and "other," which he described as being "targeted and singled out do [sic] to race and they used a member of the army lie [sic] against me." (Ohio Charge of Discrimination at PageID 95.) Moreover, Holland's "summar[y] [of] the acts of discrimination" detailed the investigation of his drill letters, alleges "disrespect" from Kuznik, and alleges Kuznik and Brown "spread vicious lies about me . . . and have made this into a hostile work environment." (*Id*.) However, Holland did not file any charges of discrimination

-11-

against Kuznik or Brown. (Holland Dep. Tr. at PageID 462–63.) Finally, Holland did not check the box for "different terms and conditions of employment," and he did not file a Charge for retaliation. (Ohio Charge of Discrimination at PageID 95; Holland Dep. Tr. at PageID 462–63.)

On June 1, 2023, the OCRC dismissed the matter, finding "it is NOT PROBABLE that [APD] has engaged in an unlawful discriminatory practice in violation of Ohio Revised Code Chapter 4112," and thereby ordered the matter dismissed. (ECF No. 22 Ex. 2, OCRC Determination Letter at PageID 849–50.) Moreover, on August 21, 2023, the United States Equal Employment Opportunity Commission ("EEOC") informed Holland that they had "adopted the findings of the state or local fair employment practices agency that investigated your charge." (ECF No. 7 Ex. 6, EEOC Decision Letter at PageID 97.) The EEOC also gave Holland notice of his "right to sue . . . on this charge under federal law . . . WITHIN 90 DAYS of your receipt of this notice." (*Id.*)

## B. Procedural Background

On January 3, 2024, Holland filed a seven-count Complaint (ECF No. 1) in this court, against Defendants City of Akron, Kuznik, and Brown. In it, he advances five claims under federal law, 42 U.S.C. §§ 1983, 2000(e) and 38 U.S.C. § 4311, and two claims under state law, O.R.C. § 4112.02(I) and (A). The Complaint alleges: two claims under § 1983, for Unreasonable Seizure/Malicious Prosecution by Defendants Kuznik and Brown (Count I), and *Monell* municipal liability for Unconstitutional Custom, Policy, and Practice (Count II); two violations of Title VII for Retaliation by all Defendants (Count III), and Racial Discrimination by Defendants City of Akron and Kuznik (Count IV); a claim for USERRA Discrimination by all Defendants (Count V); and two violations of Ohio law for Discriminatory Retaliation by all Defendants (Count VI); and Racial Discrimination

by Defendants City of Akron and Kuznik (Count VII). (Compl. at PageID 8–14.) Defendants filed their Answer (ECF No. 7) on March 4, 2024.

On April 14, 2025, Defendants timely filed the instant Motion for Summary Judgment. (ECF No. 28.) On May 28, 2025, Holland filed his Opposition (ECF No. 33),[1] and on June 25, 2025, Defendants filed their Reply. (ECF No. 39.) The matter is now fully briefed and ripe.

## II. LEGAL STANDARD

Summary judgment is governed by Federal Rule of Civil Procedure 56(a), which provides:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a). A party asserting there is or is not a genuine dispute of material fact must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). In reviewing summary judgment motions, courts must view the evidence in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990). A fact is "material" if its resolution affects the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477

---

[1] Plaintiff also filed a Motion for Leave to Amend (ECF No. 34) on May 30, 2025, which the court denied for lack of good cause in a separately issued Order.

U.S. 242, 248 (1986). In most cases, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict." *Id*. at 252. However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Scheibil*, 188 F.3d 365, 369 (6th Cir. 1999).

The moving party has the burden of production to make a *prima facie* showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). The  moving party can meet this burden by: (1) submitting "affirmative evidence that negates an essential element of the nonmoving party's claim," or (2) demonstrating "to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* If the moving party meets its burden of production, then the non-moving party must point out specific facts in the record which create a genuine issue of material fact. *Zinn v. United States*, 885 F. Supp. 2d 866, 871 (N.D. Ohio 2012) (citing *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992)). The non-movant must show "more than a scintilla of evidence to overcome summary judgment;" it is not enough to show that there is slight doubt as to material facts. *Zinn*, 885 F. Supp. 2d at 871 (quoting *Fulson*, 801 F. Supp. at 4). Finally, the trial court does not have "a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citation omitted).

### III. DISCUSSION

Defendants City of Akron, Kuznik, and Brown seek summary judgment in their favor on all counts, "on the grounds that no genuine issue of material fact exists and because Defendants are entitled to judgment as a matter of law." (Mot. at PageID 1330.) Holland responds that, "Defendants' [Motion] is premised on the dubious proposition that Defendants held no ill will . . . and did nothing

-14-

more than conduct a good-faith investigation . . . . This proposition is, however, substantially contradicted by the record evidence in this case and the reasonable inferences." (Opp'n at PageID 1391.) Holland further contends summary judgment cannot be granted because "Defendants' motivations and credibility are issues of fact that must be resolved by a jury." (*Id.*)

The court will evaluate each of Holland's seven claims to determine whether there is a genuine dispute of material fact, such that a reasonable jury could find in his favor.

**A.    Section 1983 Claims**

Defendants seek summary judgment on Holland's Section 1983 claims in Counts One and Two. Section 1983 provides a remedy for any person deprived of their constitutional rights by another person acting under the color of state law. *See* 42 U.S.C. § 1983. To state a claim under § 1983, the Complaint must show that: "(1) [plaintiff] was deprived of a right secured by the Constitution or laws of the United States, and (2) the deprivation was caused by a person acting under color of state law." *Carmichael v. City of Cleveland,* 881 F. Supp. 2d 833, 847 (N.D. Ohio 2012) (citing *Redding v. St. Eward,* 241 F.3d 530, 532 (6th Cir. 2001)).

In this case, Holland alleges two § 1983 claims: Malicious Prosecution in violation of the Fourth Amendment (Count I), and *Monell* liability (Count II). Defendants argue Holland cannot prevail on his § 1983 claims, because he "cannot establish that he was deprived of a right guaranteed by the Constitution or federal law." (Mot. at PageID 1354.)

    1.    Personal-Capacity Suits Against Kuznik and Brown for Malicious Prosecution

In Count One, Holland alleges malicious prosecution by Defendants Brown and Kuznik. (Compl. ¶¶ 28–32.) A malicious prosecution claim requires a plaintiff establish "all four elements":

First, [...] a criminal prosecution was initiated against the plaintiff and

-15-

> that the defendant made, influenced, or participated in the decision to prosecute the plaintiff [...] Second, because a section 1983 claim is premised on the violation of a constitutional right, the plaintiff must show that there was a lack of probable cause for the criminal prosecution [...] Third, the plaintiff must show that, 'as a consequence of the legal proceeding,' the plaintiff suffered a deprivation of liberty,' as understood in our Fourth Amendment jurisprudence, apart from the initial seizure, [...] and fourth the criminal proceeding [was] resolved in the plaintiff's favor.

*Ellis v. Yasenchack*, No. 1: 22 CV 815, 2024 WL 6816908, at *5 (N.D. Ohio Sept. 30, 2024) (citing *Sykes v. Anderson*, 625 F.3d 294, 308–09 (cleaned up)), *appeal dismissed,* No. 24-3892, 2025 WL 2427724 (6th Cir. Aug. 22, 2025). Here, Holland argues Defendants "had no probable cause to believe [he] committed these alleged crimes," yet acted with "retaliatory motive to get Holland criminally prosecuted, even after obtaining exculpatory information." (Compl. ¶ 31.) In their Motion, Defendants argue this claim is "without merit," because Holland fails to establish the first, second, and third elements of malicious prosecution. (Mot. at PageID 1351–54.)

Holland names Kuznik and Brown in their individual capacities. (Compl. at PageID 8.) State actors sued in their individual capacity may raise the affirmative defense of qualified immunity, requiring the plaintiff to show their conduct violated "clearly established" statutory or constitutional rights, of which a reasonable officer would have known. *See, e.g.*, *Venema v. West*, 133 F.4th 625, 632 (6th Cir. 2025); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A plaintiff must show it was clearly established that their challenged act or omission was unlawful, as "assessed in the context of each [officer's] specific conduct." *Reilly v. Vadlamudi*, 680 F.3d 617, 624 (6th Cir. 2012).

In the Sixth Circuit, it is clearly established an officer violates the "Fourth Amendment right

-16-

to be free from malicious prosecution" if they "'made, influenced, or participated in the decision to prosecute the plaintiff' by, for example, 'knowingly or recklessly' making false statements that are material to the prosecution either in reports or in affidavits . . . ." *King v. Harwood*, 852 F.3d 568, 582—83 (6th Cir. 2017). Thus, "[t]he first element of the malicious-prosecution claim is met when an officer 'could reasonably foresee that his misconduct would contribute to an independent decision that results in a deprivation of liberty' and the misconduct actually does so." *Jackson v. City of Cleveland*, 925 F.3d 793, 820–21 (6th Cir. 2019) (quoting *Sykes*, 625 F.3d at 316). To overcome qualified immunity, Holland must show a genuine dispute as to whether the Defendants' conduct "would permit an inference of blameworthiness or culpability," and a reasonable jury could find their "misconduct influenced the decision to bring charges." *Meeks v. City of Detroit, Michigan*, 727 F. App'x 171, 178 (6th Cir. 2018); *Jackson*, 925 F.3d at 821. Moreover, Defendants' "misconduct" must be "deliberate or reckless conduct," not mere "negligence or innocent mistake." *Meeks*, 727 F. App'x at 178 (citations and quotation marks omitted).

Notably, regardless of the above, ordinarily, "if there [is] probable cause to prosecute . . . there [is] no constitutional violation." *Meeks*, 727 F. App'x at 178. Moreover, the existence of probable cause is presumed if the plaintiff was indicted by a grand jury. *Caskey v. Fenton*, No. 22-3100, 2022 WL 16964963, at \*9 (6th Cir. Nov. 16, 2022) ("grand jury indictment creates a presumption of probable cause for purposes of malicious prosecution."). However, this presumption is rebuttable. *Caskey*, 2022 WL 16964963, at \*9. Here, the grand jury indicted Holland on April 16, 2021. (Indictment at PageID 92–93.) As a result, the court presumes probable cause, and, in turn, that

-17-

no constitutional violation occurred. *Caskey*, 2022 WL 16964963, at *9; *Meeks*, 727 F. App'x at 178. Thus, Holland must rebut this presumption, which requires demonstrating: (1) "in the course of setting a prosecution in motion, [Defendants] either knowingly or recklessly made false statements," which (2) were "material to the ultimate prosecution," and (3) "[did] not consist solely of grand-jury testimony or preparation for that testimony.'" *Caskey*, 2022 WL 16964963, at *9. Generally, this requires evidence of "affirmative misrepresentations and omissions" or "'misstatements and falsehoods in . . . investigatory materials,'" that "influence a prosecutor's decision to bring charges." *Meeks*, 727 F. App'x at 178; *Jackson*, 925 F.3d at 820–21 (quoting *Sykes*, 625 F.3d at 316). In their Motion, Defendants argue Holland "fail[s] to rebut the presumption that the grand jury indictment constitutes proof of probable cause." (Mot. at PageID 1353–54.)

Here, the court finds Holland cannot establish that Defendants acted knowingly or recklessly. Holland's malicious prosecution claim alleges that, "criminal proceedings . . . would not have been instituted in the first place were it not for Defendants' inadequate investigation and retaliatory motive to get Holland criminally prosecuted, even after obtaining exculpatory information." (Compl. ¶ 31.) As an initial matter, Holland's bare conclusory allegations of inadequate investigation and retaliatory motives are not supported by reference to the record, but even if they were, they do not rebut the presumption that probable cause exists when plaintiff was indicted by a grand jury. *See Caskey*, 2022 WL 16964963, at *9. As already explained, he must rebut the presumption through evidence that Defendants "knowingly or recklessly made false statements" or false evidence. *Id.* According to Defendants, Holland cannot establish those necessary falsehoods to overcome the presumption. (Mot. at PageID 1353–54.) In his Opposition, Holland responds that, "a reasonable trier of fact could

-18-

conclude that Defendants made material omissions or misrepresentations regarding the newly discovered exculpatory evidence they received from Sgt. Hoffman in order to continue the prosecution against Holland without probable cause." (Opp'n at PageID 1408.) Although Holland references both "material omissions or misrepresentations," his argument concerns only alleged omissions by Defendants. (*Id.*) He argues: "there is ample evidence . . . Defendants had some animus against Plaintiff, so when they obtained clearly exculpatory evidence that should have ended the prosecution . . . , they deliberately took no action or insufficient action to bring the prosecution to an end." (*Id.* at PageID 1407.) Thus, in essence, Holland argues Defendants made "affirmative omissions"—*i.e.*, "deliberately took no action or insufficient action"—and those omissions were done "knowingly or in reckless disregard for the truth." (*Id.*); *Meeks*, 727 F. App'x at 178.

However, even viewing the record in the light most favorable to Holland, he fails to establish Brown or Kuznik engaged in knowing or reckless falsehoods. *See Meeks*, 727 F. App'x at 177–78. The "exculpatory evidence" Holland references is evidence of text messages, showing Hoffman gave him permission to edit the drill letter template. (Opp'n at PageID 1407–08.) However, Holland himself possessed this evidence, before any charges were brought, and his defense attorney only provided it to the prosecution in March 2022, "just months before trial." (*Id.*; Holland Dep. Tr. at PageID 320–21, 423.) Holland contends this evidence "defeated any notion of probable cause," so "[a] reasonable trier of fact could conclude that Defendants withheld from and misrepresented this exculpatory information to the prosecutors to ensure the prosecution would continue." (Opp'n at PageID 1407–08.) First, the court notes alleged falsehoods or omissions by Defendants *after* Holland was indicted, cannot serve to rebut the presumption of probable cause. The presumption is rebutted if an officer "*in the course of setting a prosecution in motion*, either knowingly or recklessly made

false statements," which then "[were] material to the ultimate prosecution of the plaintiff." *Caskey*, 2022 WL 16964963, at *9 (emphasis added). By the time Holland cites—at the earliest, March 2022—his grand jury indictment was approaching the one-year mark, with the decision to prosecute having been made even earlier. Holland does not claim Defendants knew this information, or any other exculpatory information, before his attorney gave it to the prosecution. To the contrary, Holland states that "[his] defense attorney provided Brown a copy of [the] text message" from Hoffman "[a]pproximately three months prior to trial," citing to Brown's Deposition. (Opp'n at PageID 1399.) Specifically, Holland cites Brown's testimony that: "[Hoffman] told [Brown] for the first time in that third interview that he had actually given Holland permission to revise and use that letter." (Brown Dep. Tr. at PageID 1240.) Brown indicated that this interview occurred in "April or March 2022," after "some text messages were given to the prosecutor." (*Id.* at PageID 1238.)

Furthermore, there is no evidence upon which a reasonable jury could conclude Brown or Kuznik acted with deliberate or reckless disregard, even as to this information. Holland brazenly asserts, without citing evidentiary support, that: "Defendants, after learning that Sgt. Hoffman had indeed given Plaintiff permission . . . did nothing to stop the ongoing prosecution of Plaintiff." (Opp'n at PageID 1418.) However, Holland has not demonstrated Defendants knowingly or recklessly withheld anything in the course of the investigation or prosecution. The only evidence in the record of Kuznik's involvement in the events of this case indicates that he was not even involved after he submitted his confidential report in March 2021.  (Kuznik Decl. ¶ 12.) Holland does not offer contrary evidence. Additionally, the record shows Brown learned of the information when Holland's defense attorney provided it in March 2022—and that, as soon as he was made aware of the possibly exculpatory information, he re-interviewed Hoffman and wrote an additional Report.

(Opp'n at PageID 1399; 03/24/22 Report of Investigation at PageID 89–91; *see also* Mot. at PageID 1348.) That interview revealed that Holland was not permitted to "continue using this template following Hoffman's deployment," nor "indefinitely"; that he "expected any of his soldiers to contact him before creating a drill letter for training, especially one with his name on it"; and that Holland "was not even in the Unit at the time he used the form document" that sparked the investigation. (Reply at PageID 1824; Holland Dep. Tr. at PageID 439; Mot. at PageID 1348.) Far from "d[oing] nothing," (Opp'n at PageID 1418), Brown conducted additional investigation, and compiled findings to publish an updated Report—a Report which Holland does not dispute the accuracy of. (03/24/22 Report of Investigation at PageID 89–91; Holland Dep. Tr. at PageID 437–39.) Thus, Holland fails to demonstrate Defendants' made material omissions in knowing or reckless disregard for the truth.

Moreover, Holland does not argue that any other material falsehoods existed. As Defendants' Motion states, it is undisputed that Kuznik "only prepared a confidential statement, based on information he received, and that Plaintiff could not refute," and it is similarly undisputed that Brown's investigation "accurately summarized the information presented to him by various witnesses." (Mot. at PageID 1353–54.) Thus, Hoffman fails to rebut the presumption of probable cause because of his Indictment.

However, "even if there was no probable cause," Holland still fails to make out a malicious prosecution claim, because he cannot establish Defendants' "deliberate or reckless conduct." *Meeks*, 727 F. App'x at 178. As explained above, the record does not support that Defendants made material omissions or misstatements. Otherwise, Holland's Complaint and Opposition make sweeping accusations, such as that Defendants "misrepresent[ed] key facts" or conducted "inadequate investigations." (Opp'n at PageID 1405; Compl. ¶ 31.) Even if the court set aside Holland's failure

-21-

to provide evidentiary support or cites to the record, these allegations *at most* show "conduct [that] was the result of negligence or innocent mistake, rather than deliberate or reckless," which is insufficient to overcome qualified immunity. *Meeks*, 727 F. App'x at 178. The record contains no evidence showing Defendants' knowing or reckless conduct materially influenced the Summit County Prosecutor's Office's decision to prosecute him. (*See* Holland Dep. Tr. at PageID 270–72.) Accordingly, Holland cannot establish the elements of a malicious prosecution claim, and Defendants are entitled to summary judgment.

2.      *Monell Liability*

In Count Two, Holland alleges Unconstitutional Custom, Policy, and Practice by the City of Akron (or the "City"), pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). (Compl. at PageID 9.) Defendants seek summary judgment, arguing Holland: (1) "cannot establish that he was deprived of a right guaranteed by the Constitution or federal law because his malicious prosecution claim is without merit," and (2) "did not allege the existence of" unconstitutional policy or custom, "beyond conclusory statements." (Mot. at PageID 1354–55.) This argument is well-taken. Under *Monell*, local government units may be sued directly for monetary, declaratory, or injunctive relief, pursuant to § 1983, if they are "alleged to have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988) (citing *Monell*, 436 U.S. at 690). Moreover, because "a municipal police department is a sub-unit of its municipality," claims of misconduct are appropriately brought against the municipalities those police departments serve. *Warman v. Mount St. Joseph Univ.*, 144 F.4th 880, 891 (6th Cir. 2025). When assessing municipal liability, courts consider: "(1) whether plaintiff's harm was caused by a

-22-

constitutional violation, and (2) if so, whether the city is responsible for that violation." *Collins v. City of Harker Hts.*, *Tex.*, 503 U.S. 115, 120 (1992).

Here, Holland alleges the City caused him to suffer malicious prosecution, because it "ordered, permitted, tolerated, or otherwise conspired to," or "was deliberately indifferent to a pattern and practice whereby its officials engage in retaliatory investigations and malicious prosecutions . . . ." (Compl. ¶ 34.) This claim fails at the first step of the inquiry, whereby the plaintiff's harm must have been "caused by a constitutional violation." *Collins*, 503 U.S. at 120. As explained above, *supra* Section (A)(1), Holland cannot make out a malicious prosecution claim, and he does not allege the City caused any other constitutional violation. Thus, he cannot prevail.

However, even if Holland had shown he suffered constitutional harm, his claim also fails at the second step of the municipal liability inquiry. A plaintiff seeking to hold a municipality liable for their constitutional injury must establish: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] or acquiescence [to] federal rights violations." *D'Ambrosio v. Marino*, 747 F.3d 378, 387 (6th Cir. 2014) (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)). Plaintiffs typically must "point to . . . existing policy or lack thereof, or compile instances of similar events to the ones forming the basis for the claim." *Rolen*, 2013 WL 12145960, at *14. Here, Holland fails to do either, and the Complaint contains only broad conclusory statements. (Compl. ¶¶ 33–36.) Holland does not point to illegal policy, nor allege ratification by an official with decisionmaking authority, inadequate training, nor a custom or tolerance of violations. Furthermore, Holland's Opposition does not address his *Monell* claim whatsoever, failing to respond to Defendants' Motion. (*See* Opp'n at

PageID 1404–18.) Accordingly, summary judgment is granted to the City on this claim.

**B.      Title VII Claims**

In Count Three, Holland alleges Title VII Retaliation against Defendant City of Akron, and against Defendants Kuznik and Brown in their official capacities. (Compl. at PageID 9–10.) In Count Four, Holland alleges Racial Discrimination in violation of Title VII against Defendant City of Akron, and Defendant Kuznik in his official capacity. (*Id.* at PageID 10–11.)

As an initial matter, Defendants first seek summary judgment on all Title VII claims against Kuznik and Brown, arguing: "it is well-established that an individual cannot be held personally or individually liable under Title VII," and claims "against Kuznik and Brown in their official capacity . . . are redundant and duplicative of the claims alleged against Akron, Plaintiff's employer." (Mot. at PageID 1356 (citing *Gravely v. Thiel*, No. 1:22-CV-01588, 2023 WL 6049323 (N.D. Ohio Sept. 15, 2023); *Mitchell v. Fujitec Am., Inc.*, 518 F. Supp. 3d 1073, 1101 (S.D. Ohio 2021).) These arguments are well-taken. There is no question that "Title VII does not include individual liability, even for supervisors. Indeed, '[t]he law in this Circuit is clear that a supervisor who does not otherwise qualify as an employer cannot be held personally or individually liable under Title VII.'" *Mitchell*, 518 F. Supp. 3d at 1100 (citing *Little v. BP Expl. & Oil Co.*, 265 F.3d 357, 362 (6th Cir. 2001)). Thus, an individual can only be held liable if they "qualify as an employer," and "official capacity liability is simply another avenue . . . to establish liability on an employer." *Maudlin v. Inside Out Inc.*, No. 3:13-CV-00354-TMR, 2014 WL 1342883, at *3–4 (S.D. Ohio Apr. 3, 2014). This means, "[t]herefore, an official capacity suit is redundant and duplicative of the suit against" a named employer. *Id.* at *4. Here, Holland names the City of Akron as Defendant to his Title VII claims, rendering the official-capacity suits against Kuznik and Brown duplicative. (Compl. at

PageID 9–11.) Accordingly, Defendants are entitled to summary judgment as to the Title VII claims against Kuznik and Brown in their official capacities. The court now turns to whether the Title VII claims against the City of Akron survive summary judgment.

       1.       <u>Whether the City is Liable for Retaliation Under Title VII</u>

In Count Three, Holland alleges he suffered retaliation in violation of Title VII. He alleges "Kuznik took adverse action against Holland," after "Holland engaged in a protected activity when he complained to his union representative about racial discrimination by Defendant Kuznik with respect to his treatment of black officers and indicated his intention to file a formal grievance." (Compl. ¶¶ 37–43.) Holland claims he suffered "hostile and retaliatory treatment," in the form of "unwarranted criticism of [his] work," and "an inadequate and flawed investigation that was designed to institute a criminal prosecution . . . for which there was no probable cause." (*Id.* ¶ 41.)

Defendants move for summary judgment for two reasons. First, they argue that Holland "failed to exhaust his administrative remedies as it relates to his retaliation claim pursuant to Title VII." (Mot. at PageID 1357–58.) Additionally, they argue Holland cannot establish retaliation because he "did not engage in protected activity that [Defendants] were aware of." (*Id.* at PageID 1359–60.) Each argument is well-taken.

       *a)*       *Holland failed to exhaust his administrative remedies before filing suit*.

As is well-established, "[i]ndividuals who bring Title VII discrimination claims in federal court must exhaust their administrative requirements first," by filing with the EEOC. *Moore v. Coca-Cola Bottling Co. Consol.*, 113 F.4th 608, 621–22 (6th Cir. 2024) (citations omitted). A plaintiff's "failure to exhaust in the context of Title VII claims is an affirmative defense that defendants 'bear the burden of pleading and proving.'" *Id.* at 622 (citing *Lockett v. Potter*, 259 F.

App'x 784, 786 (6th Cir. 2008)). Before suing under Title VII, a plaintiff "must file a charge of discrimination with the EEOC that includes all claims the employee intends to bring in district court," and, even then, "[o]nly claims that are included in the charge or are 'reasonably related to or grow out of the factual allegations in the EEOC charge' may be heard in federal court.'" *Russ v. Memphis Light Gas & Water Div.*, 720 F. App'x 229, 236 (6th Cir. 2017) (quoting *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361–62 (6th Cir. 2010)).

Here, Defendants raised the matter of EEOC exhaustion in their Answer, and in the instant Motion, they argue that Holland did, in fact, fail to exhaust his administrative remedies. (Ans. at PageID 48; Mot. at PageID 1357–58.) Specifically, they argue: "Plaintiff never filed a charge against Kuznik or Brown," and "Plaintiff agreed he did not make a claim of retaliation" to the EEOC. (Mot. at PageID 1358 (citing Holland Dep. Tr. at PageID 462–63).) In his Opposition, Holland does not respond to Defendants' assertion that he failed to properly exhaust EEOC remedies. (Opp'n at PageID 1409–14.) In fact, Holland simply does not address the question of administrative exhaustion, in any of his briefings. (*Id.*) Moreover, the record shows Holland admitted he, "never made a claim of retaliation to the Ohio Civil Rights Commission or the EEOC." (Holland Dep. Tr. at PageID 466.) As the Sixth Circuit has explained, "[b]ecause the plaintiff in a discrimination case has the ultimate burden of proof, '[t]he pivotal question' is whether [the plaintiff] 'has presented a jury question as to each element of [the] case.'" *Finley v. City of Trotwood*, 503 F. App'x 449, 452–53 (6th Cir. 2012) (quoting *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996)). Here, Holland has not alleged, let alone demonstrated by reference to the record, that his claim even survives beyond the threshold of administrative exhaustion. By failing to address administrative exhaustion whatsoever, Holland necessarily fails to show a genuine dispute of material fact as to whether he

satisfied the "precondition to filing a Title VII suit." *Lockett*, 259 F. App'x at 786. On this basis alone, Defendants are entitled to summary judgment in their favor on this claim. *See Russ*, 720 F. App'x at 238 (granting summary judgment "on th[e] basis" plaintiff's EEOC charge was "insufficient to exhaust remedies for a Title VII retaliation claim").

However, the court also finds, even if Holland had exhausted administrative remedies, this claim still would not survive summary judgment, because he has not made out a *prima facie* case.

b)      *Even if administrative remedies had been exhausted, Holland has not sufficiently established a prima facie retaliation claim*.

To make out a *prima facie* case for Title VII retaliation, a plaintiff must show: "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Moore*, 113 F.4th at 627 (citation omitted). Tracking each element, Holland alleges: (1) he engaged in the "protected activity" of complaining about discrimination to his union representative, Cozart; (2) Kuznik knew he had done so, after Cozart informed him; and (3) thereafter, Kuznik took adverse actions against Holland, (4) because Holland had complained. (Compl. ¶¶ 39–42.) However, the evidence in the record does not reflect that Kuznik was aware of any such complaints or that Cozart himself knew of any race-related issues.

Despite Holland's claim that he reported discrimination to Cozart "sometime in 2020," (Holland Dep. Tr. at PageID 239–41), the "text messages [he] exchanged with Cozart regarding this matter on April 4 and April 5, 2020," submitted with his Declaration (Holland Decl. ¶ 6) do not support his assertion.  However, these text messages reflect only that Holland complained about

"assignments" and "days off," telling Cozart that he "would like [his] days off." (*Id.* Ex. A, Cozart Text Messages at PageID 1424–26.) In his responses, Cozart indicated his belief that the scheduling matter with which Holland took issue was "total BS," and that he "asked them to calculate any [overtime] you would be owed." (*Id.*) However, there are no other complaints from Holland, accusations against Kuznik specifically, or mentions of race or discrimination. (*Id.*) Furthermore, the record offers no support for Cozart having spoken to Kuznik *at all* about his conversation with Holland, let alone informed him that Holland complained of discrimination. In his Declaration, Holland states that, after the above text exchange discussing Holland's issue with his assignment: "[t]he next day, I followed up with Cozart to ask if he had addressed the matter with Kuznik, to which Cozart replied 'not yet.'" (*Id.*) Holland never confirmed whether or not Cozart spoke to Kuznik. In fact, he admits that he simply assumes the conversation between Cozart and Kuznik happened: "It was my understanding that Cozart thereafter spoke to Kuznik about my complaints." (Holland Decl. ¶ 7.) Such speculation is not evidence, and the record otherwise contains no evidence that the alleged conversation between Cozart and Kuznik happened or that if so, it pertained to discrimination. Cozart's Declaration states that he reviewed the audio recording of their call, which only "confirm[ed] that in response to Officer Holland's inquiry of me regarding whether I ever spoke with then Lt. Kuznik . . . about how Officer Holland claimed that Lt. Kuznik talked to and treated [him], I stated and confirmed . . . in April 2021, that I did not speak with Lt. Kuznik about those allegations." (Mot. Ex. 1, Cozart Decl. ¶¶ 4–5.) Moreover, Kuznik's Declaration states: "I do not believe I have ever spoken to Clay Cozart about Holland. I have reviewed an audio recording . . .whereby Cozart affirmed that he did not discuss Holland's alleged concerns with me." (Mot. Ex. 2, Kuznik Decl. at PageID ¶ 13.) Holland does not provide nor point to any evidence which would

-28-

create a genuine dispute as to whether Kuznik had the requisite knowledge to make out a retaliation claim. In fact, his Opposition does not address these statements by Cozart or Kuznik, let alone refute them.

Accordingly, Holland fails to show a genuine dispute as to essential elements of his retaliation claim, and Defendants are entitled to summary judgment.

2.      Whether the City is Liable for Hostile Work Environment Under Title VII

Although Holland labels Count Four "Racial Discrimination," the Complaint alleges only a Hostile Work Environment claim. (Compl. ¶¶ 44–51.) To establish a *prima facie* hostile work environment claim, a plaintiff "must demonstrate: that (1) [he] belongs to a protected group; (2) [he] was subject to unwelcome harassment; (3) that harassment was based on race; (4) the harassment was sufficiently severe or pervasive to alter the conditions of [his] employment; and (5) the employer knew or should have known about the harassment and failed to take appropriate remedial action." *Robinson v. Quicken Loans, LLC*, No. 21-1392, 2022 WL 4234072, at \*8 (6th Cir. Sept. 14, 2022) (citation omitted). Here, Holland alleges he was "harassed based on his race" by Kuznik, which "created a hostile work environment," whereupon "Defendants failed to take reasonable care to prevent and correct the harassing behavior even after Holland had reported Kuznik's mistreatment of Black officers, including Holland himself." (*Id.* ¶¶ 48–51.)

In their Motion, Defendants argue Holland cannot make out a *prima facie* claim for a hostile work environment, because "[n]o reasonable juror could find Plaintiff suffered racial harassment severe or pervasive enough to alter the terms, conditions, or privileges of employment." (Mot. at PageID 1361–63.) A hostile work environment claim under Title VII requires, "evidence of harassment that 'unreasonably interfer[es] with [his] work performance and creat[es] an objectively

-29-

intimidating, hostile, or offensive work environment.'" *Younis*, 610 F.3d at 362 (alteration in original) (quoting *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008)). To prevail, Holland must show the workplace was "permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive," to the point of "creat[ing] an abusive working environment." *Robinson v. Quicken Loans*, LLC, No. 21-1392, 2022 WL 4234072, at *8 (6th Cir. Sept. 14, 2022). Given this high standard, the alleged conduct generally must be of a high frequency and involve conduct that is "physically threatening or humiliating." *Id.* Allegations of a defendant's "mere offensive utterance," or "mere disrespect or antipathy" will not suffice, nor will "facially neutral abusive conduct," unless there is "other *overtly* ... discriminatory conduct." *Id.* (quoting *Jordan v. City of Cleveland*, 464 F.3d 584, 596 (6th Cir. 2006)).

The court finds Holland has not met the high standard to make out a hostile work environment claim. The Complaint makes the bare assertion that Holland "was harassed based on his race," but contains no specific allegations of harassment. (Compl. ¶ 48.) Moreover, even viewing evidence and drawing all reasonable inferences in Holland's favor, the undisputed record does not support a hostile work environment claim. In his Deposition, Holland stated that he "started noticing . . . [Kuznik] would have a nasty, snappy, rude attitude regarding anything I asked of him," and that "the way [Kuznik] would talk to [himself and other black officers] was really different, whether he would yell at us for no reason." (*Id.* at PageID 247–48.) In his Opposition, Holland claims that, other than "the way he and other black officers were treated," he suffered harassment in the forms of "his drill letters [being] constantly scrutinized," and "having a malicious investigation and prosecution brought against him." (Opp'n at PageID 1413–14.)

First, these arguments do not demonstrate harassment that is pervasive and severe throughout

-30-

the workplace. In any event, the court already explained the meritless nature of Holland's arguments regarding malicious prosecution. Further, the record reflects that none of Holland's drill letter requests for leave were denied or previously flagged, until December 2020. (Kuznik Decl. ¶ 14.) The record further reflects the December 2020 drill letter was investigated by OPSA because Kuznik identified it as "an anomaly compared to the other drill letters," based on his experience reviewing such letters "throughout [his] time as a supervisor and the ones [he] personally produced . . . in the Marine Reserves." (Kuznik Dep. Tr. at PageID 932.) There is nothing in the record to indicate that, instead, Holland's letter was flagged because of specific scrutiny directed towards him, nor would that be sufficient to show a hostile work environment. Otherwise, Holland does not allege instances of hostility, racist or discriminatory remarks, or other harassment by colleagues or supervisors. He also does not dispute Kuznik's statement that they "had very little personal involvement" before the events of this case. (Kuznik Dep. Tr. at PageID 894–96.) Furthermore, it is undisputed that: "[n]o one has ever said anything to [Holland] about the color of [his] skin or [his] race" at APD, including Kuznik. (Holland Dep. Tr. at PageID 248.)

Holland has, at *best*, though arguably has not even, "cite[d] only discrete acts" or "isolated comments," and this is not enough. *Younnis*, 610 F.3d at 362. Indeed, the Sixth Circuit "regularly reject[s] hostile-work-environment claims involving conduct considerably more egregious." *Singleton v. PSA Airlines, Inc.*, No. 21-3423, 2022 WL 875869, at *3 (6th Cir. Mar. 24, 2022) (citation omitted). *See, e.g.*, *id.* (citing *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 512 (6th Cir. 2011)) ("no hostile work environment where supervisors called Jesse Jackson and Al Sharpton 'monkeys' and said black people should 'go back to where they came from'"); *Phillips v. UAW Int'l*, 854 F.3d 323, 325 (6th Cir. 2017) (explaining evidence of "violent conduct" and "frequent racial

comments" was insufficient); *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 734 (6th Cir. 2006) ("[Plaintiff] has easily satisfied her burden to produce evidence from which a hostile work environment can be found. . . . [She] testified that she was subjected to daily verbal harassment and threats and produced evidence corroborating her testimony. . . . These events . . . were clearly traumatic . . . based on her evidence that they caused her to become suicidal and necessitated institutionalization and counseling."). In light of this, there is no genuine dispute as to whether Holland suffered harassment so pervasive and severe as to demonstrate a hostile work environment.

Accordingly, "no reasonable juror could find [plaintiff] suffered racial harassment severe or pervasive enough to alter the terms, conditions, or privileges of employment," *Singleton*, 2022 WL 875869, at *2, and Defendants are entitled to summary judgment on this claim.

3.      Whether Holland Can Argue Racial Discrimination For the First Time In His Opposition

In his Opposition, Holland proffers, for the first time, allegations of suffering racial discrimination in violation of Title VII. (Opp'n at PageID 1409–11.) As stated above, despite Count IV being labeled "Racial Discrimination" in the Complaint, the allegations thereunder pertain only to a hostile work environment claim. (Compl. ¶¶ 44–51.) Accordingly, Holland "raise[s] the claim[] for the first time in his opposition to summary judgment," and it fails on this basis alone. *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 666 (6th Cir. 2012) (citation omitted) ("[A] plaintiff may not expand his claims to assert new theories for the first time in response to a summary judgment motion."); *see also id.* (quoting *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) ("A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion.").

In any event, the court finds Holland fails to make out a *prima facie* case for discrimination

-32-

under Title VII. In cases "when (like here) a disparate-treatment claim relies exclusively on indirect evidence, [courts] apply the *McDonnell Douglas* burden-shifting framework." *Singleton*, 2022 WL 875869, at *3 (citation omitted). Under this framework, a plaintiff establishes a *prima facie* discrimination case, "by showing (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position at issue, and (4) she was treated differently than similarly situated employees who aren't members of her protected class." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Singleton*, 2022 WL 875869, at *3 (citing *Chattam v. Toho Tenax Am.*, 686 F.3d 339, 347 (6th Cir. 2012)). If each element is established, "the burden shifts to the employer 'to articulate some legitimate, nondiscriminatory reason' for the plaintiff's adverse employment action," after which "the burden shifts back to the plaintiff to show pretext—*i.e.* that the employer's explanation was fabricated to conceal an illegal motive." *Singleton*, 2022 WL 875869, at *3 (first citing *McDonnell Douglas*, 411 U.S. at 802; and then quoting *Chen v. Dow Chem. Com*., 580 F.3d 394, 400 (6th Cir. 2009)).

Even if Holland had pleaded Title VII discrimination in his Complaint, his claim fails at the first step. Defendants rightfully assert that Holland "has not and cannot establish that he was treated less favorably than a similarly-situated individual outside of the protected class." (Reply at PageID 1828.) Holland has not identified "a similarly situated non-African-American employee whom [APD] treated more favorably." *Singleton*, 2022 WL 875869, at *3. In fact, Holland does not offer *any* comparator, let alone demonstrate they are "similarly situated in all relevant respects." *Id.* Moreover, Holland does not dispute Defendants' claim that: "[t]o be clear, there is no record evidence of any individual, Caucasian or African-American, other than Plaintiff, who submitted an admittedly forged document to receive differential pay." (Reply at PageID1828.) Indeed, it is

undisputed that Holland "ha[s] no knowledge of anybody doing what [he] did," and does not know of "anybody else," of any race, "who was also involved in military service, who submitted a drill letter, they self-created on a holiday for drill a couple of days later, on another holiday." (Holland Dep. Tr. at PageID 500-01.) Having failed to identify a similarly-situated individual, Holland cannot make out a *prima facie* discrimination case, entitling Defendants to summary judgment on this claim.

## C. USERRA Claim

Count Five asserts a claim for Discrimination under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"). (Compl. ¶¶ 52–58.) Although "all Defendants" are named in the Complaint, this claim is in-effect brought only against the City of Akron; both because Kuznik and Brown are named only in their official capacities, (*id.*), which is duplicative of a suit against the City, and because Holland did not respond to Defendants' argument that Kuznik and Brown cannot be sued under USERRA, since they neither qualify as Holland's employer nor possess the power to hire or fire employees. (*See* Mot. at PageID 1364; Reply at PageID 1830.)

USERRA protects employees who also serve in the military, by "prohibit[ing] an employer from discriminating against a member of the uniformed services for his membership in or obligations to those services, and from taking an adverse employment action against an employee who exercises his rights under the statute. *Savage v. Fed. Express Corp.*, 856 F.3d 440, 446 (6th Cir. 2017) (citing 38 U.S.C. § 4311). Under USERRA, an employer is "prohibit[ed] . . . from taking an adverse employment action against an employee in retaliation for his exercise of rights under USERRA." *Savage*, 856 F.3d at 447 (citing 38 U.S.C. § 4311(b)). An employer will be liable if "a motivating factor in [their] action" was the plaintiff's "obligation for [military] service," or "action to enforce a protection [USERRA] afford[s]." *Id.* (internal quotation marks omitted) (citing 38 U.S.C. §

-34-

4311(c)(1)). Courts evaluate USERRA discrimination claims "in two steps," namely:

> First, the plaintiff "has the initial burden of proving a prima facie case of discrimination [or retaliation] by showing, by a preponderance of the evidence, that his protected status was a substantial or motivating factor in the adverse employment action." *Petty*, 538 F.3d at 446. Once the plaintiff has established his prima facie case, "the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason." *Hance v. Norfolk Southern Ry. Co.*, 571 F.3d 511, 518 (6th Cir. 2009).

*Savage*, 856 F.3d at 447 (alteration in original). To meet the initial burden of establishing a *prima facie* case, a USERRA plaintiff must "show[] that his military service was a substantial or motivating factor in the adverse employment action," using "direct or circumstantial evidence." *Savage*, 856 F.3d at 447 (citations omitted). However, "[t]he employer may avoid liability if it 'can prove that the action would have been taken in the absence of such ... service.'" *Ragland v. BM2 Freight Servs., Inc.*, 824 F. App'x 386, 392 (6th Cir. 2020) (alteration in original) (citing 38 U.S.C. § 4311(c)(1)).

Here, Holland alleges he suffered retaliation when he exercised his rights under USERRA by "notif[ying] [APD] that he would be participating in drills and trainings." (Compl. ¶ 54.) Defendants argue his claim fails at the first step of the court's inquiry, because he "cannot establish a *prima facie* case, as Defendants had a legitimate, nondiscriminatory reason for their action, to wit: Plaintiff's dishonesty and submission of falsified documents to receive compensation." (Mot. at PageID 1363–65.) In response, Holland argues there remains a genuine dispute as to whether Defendants were "even if just in part, motivated by their frustration with Plaintiff's exercise of his rights under USERRA." (Opp'n at PageID 1415.) The court must determine whether Holland met his "burden of proving . . . , by a preponderance of the evidence, that his protected status was a substantial or motivating factor in [an] adverse employment action." *Savage*, 856 F.3d at 447.

In Count Five, Holland claims Defendants were "inconvenienced by Holland's need for leave . . . during a holiday period," and so acted "in retaliation" by "engag[ing] in a flawed and inadequate investigation that was intended to institute a malicious criminal prosecution against Holland." (Compl. ¶¶ 54–57.) He contends: "there is evidence in the record that shows (or at least creates an inference) that Defendants' investigation of Plaintiff and efforts to see him criminally prosecuted were at least, in part, motivated by Plaintiff's exercise of his rights under USERRA." (Opp'n at PageID 1414–16.) However, the court finds no genuine dispute as to whether a reasonable jury could find military service was a substantial or motivating factor in an adverse employment action taken against Holland. *See Savage*, 856 F.3d at 447. Holland does not offer direct evidence, so he must rely on indirect evidence. *See, e.g.*, *id.* In so doing, he cites to statements made by Kuznik and Brown, when they were asked about how military leave requests may impact operations, from a scheduling or staffing perspective. (Opp'n at PageID 1415–16.) First, Holland cites Kuznik's answer to the question "[w]hat happens to your staffing if someone comes in a day before, or two days before and presents a drill letter like we had seen?", which he was asked at Holland's trial:

> Historically, we have to give them the day off. So we certainly don't want to violate any codes or laws; so if someone comes in with a drill letter saying they need a particular weekend off, then we give them that weekend off. And then if someone else who was on that list to take the day off, let's say you were, for example, and you wanted to go see a T-ball game that day, we couldn't allow additional personnel off. You would be denied because we have to account for those military personnel being gone. So it takes up a spot in the book, a vacancy, for someone else to take.

(*Id.* at PageID 1415.) In addition, Holland points to Brown's "belief that Holland's exercise of his USERRA rights caused 'some harm' to [APD] due to Holland's drilling during the holidays." (*Id.* at PageID 1416.) Defendants argue Holland "misrepresents Kuznik's and Brown's testimony."

-36-

(Reply at PageID 1830.) Be that as it may, (*see* Kuznik Dep. Tr. at PageID 974–75; Brown Dep. Tr. at PageID 1299), the court is mindful that, at this stage, it must err on the side of construing evidence and reasonable inferences in Holland's favor. *See, e.g.*, *Adickes*, 398 U.S. at 153. In any event, even construing the record in the light most favorable to Holland, the evidence still does not permit a reasonable inference that his military status was a motivating factor in actions taken against him.

Contrary to Holland's argument, Kuznik's testimony states that military personnel received *preferential* treatment, as compared to non-military members, not discriminatory treatment. (Kuznik Dep. Tr. at PageID 974–75.) Similarly, Brown's "belie[f] there was some harm" that was "caused by Holland's decision to drill on those days," (Brown Dep. Tr. at PageID 1299), does not demonstrate that there was any action against him which was *motivated* by his military service. *See Savage*, 856 F.3d at 447. Holland does not point to evidence that creates a genuine dispute as to this essential element. The record lacks evidence which, in other cases, permitted an inference of USERRA discrimination—such as "comparator evidence," "anti-military comments," "instances of . . . differential treatment of veterans," or "anti-military animus by [the] decisionmaker." *See, e.g., Ragland,* 824 F. App'x at 395. Instead, the record reflects Holland was investigated based on the legitimate belief that he had engaged in fraud or forgery—a belief that was concurred on multiple occasions by other National Guard members, including in Holland's same Unit. (03/12/21 Report of Investigation; 03/24/22 Report of Investigation.) It was a concern of Holland's potential fraud and dishonesty, not his military service, which led to his investigation. Furthermore, Holland does not dispute that APD never denied him military leave or differential pay. (Holland Dep. Tr. at PageID 348–49, 448–52, 783.) He also does not dispute that he was never fired, and received all back pay he was owed. (*Id.*) Finally, the court notes that: "[e]ven if one could conclude from a very liberal

-37-

reading of the record that a scintilla of evidence of [discrimination] was found, that would nonetheless be insufficient to support a jury verdict. The jury must be able to find by a preponderance of the evidence that [discrimination] was a determining factor in the employer's decision." *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986); *see also Savage*, 856 F.3d at 447 (emphasis added) ("The [USERRA] plaintiff must first make out a prima facie case of discrimination . . . *by a preponderance of the evidence . . . .*").

Accordingly, Holland fails to meet his burden of establishing a *prima facie* case for discrimination under USERRA, and Defendants are entitled to summary judgment on this claim.

**D.    State Law Claims**

Count Six alleges Discriminatory Retaliation in violation of Ohio Revised Code § 4112.02(I), against the City of Akron, and Kuznik and Brown in their official capacities. (Compl. at PageID 12–13.) In addition, Count Seven alleges Racial Discrimination in violation of Ohio Revised Code § 4112.02(A), against the City of Akron and Kuznik in his official capacity. (*Id.* at PageID13–14.)

In a case "involv[ing] both Title VII and Ohio antidiscrimination law, the same analysis applies to both." *Finley*, 503 F. App'x at 452 (citation omitted). Similarly, "[f]ederal [l]aw provides the applicable analysis for reviewing Ohio retaliation claims." *Id.* at 455 (quoting *Baker v. The Buschman Co.*, 713 N.E.2d 487 (1998)). Having already resolved Holland's Title VII claims, his analogous state law claims are easily dealt with. As the Sixth Circuit reasoned in *Finley*:

> Because [plaintiff's] state claims for race and gender discrimination require the same prima facie evidentiary showing as her federal claims, her unmeritorious federal claims mean her state claims also fail. *See Knox v. Neaton Auto Prods. Mfg., Inc.*, 375 F.3d 451, 457 (6th Cir. 2004). So too with her retaliation and hostile-work-environment claims. . . . Because Finley's claims against both [defendants] involve the same law, evidence, and arguments, we

-38-

> affirm summary judgment for both . . . .

*Id.* The same is true in this case. Here, Holland claims he faced retaliation in violation of state law, advancing allegations identical to those in his federal retaliation claim. (Compl. ¶¶ 59–65; *see also id*. ¶¶ 37–43.) As with his analogous federal claim, he fails to address exhaustion of the applicable administrative remedies before bringing a retaliation claim, Ohio Revised Code § 4112.052(B)(1)(a), and, on the merits, fails to make out a *prima facie* retaliation case. *See supra* Section B. Likewise, Holland's claim that he suffered discrimination in violation of state law is based on the same allegations regarding "unwelcome harassment" and a "hostile, or offensive work environment" as alleged in his Title VII hostile work environment/discrimination claim. (Compl. ¶¶ 66–73; *see also id*. ¶¶44–51.) Here, too, this claim fails for the same reason its federal analog failed: "the state-law discrimination claim has the same problem that the Title VII one did—insufficient identification of the allegedly-better-treated employees." *Mitchell*, 518 F. Supp. 3d at 1102; *see supra* Section B.

Accordingly, for reasons already enunciated by the court, Holland fails to establish a *prima facie* case for retaliation and discrimination under state law.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (ECF No. 28) is hereby granted, as to all claims in Counts I–VII of the Complaint. (ECF No. 1.)

IT IS SO ORDERED.

*/s/ SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

March 30, 2026